**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-CR-10036-JEM(s)**

**UNITED STATES OF AMERICA,**

**v.**

**DANIEL GAVIN COUCH,**

**Defendant.**

_____/

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STRIKE THE GOVERNMENT'S NEW CHARGE IN THE SUPERSEDING INDICTMENT [ECF NO. 33]**

The United States of America, by and through the undersigned Assistant United States Attorney, opposes Defendant's Motion to Dismiss, or in the Alternative, to Strike the Government's New Charge in the Superseding Indictment ("Motion to Dismiss"). Defendant's Motion to Dismiss questions the government's intentions while keeping this Court in the dark about the Defendant's intent to limit the government to a single, possibly faulty, charge—which is Seamans Manslaughter. The intentions of the Defendant's Motion to Dismiss is evident by Defendant's proposed Seamans Manslaughter jury instruction—which is premised almost entirely on the Eighth Circuit ruling in United States v. McKee, 68 F.4th 1100 (8th Cir. 2023), the only criminal case to wholly dismiss a Seamans Manslaughter indictment on its face for failing to establish admiralty jurisdiction.

Defendant is not prejudiced by the government's superseding indictment and the superseding indictment was not delayed "unnecessarily" or for a tactical advantage. Defendant's

attempt to dismiss the Voluntary Manslaughter charge is simply a rouse to return to the original indictment to spring upon this Court another motion to dismiss—after jeopardy attaches--to dismiss the Seamans Manslaughter count, and bar further attempts by the federal government to prosecute Defendant for his criminal actions that destroyed a life. Based upon the facts and legal conclusions cited herein, this Court should deny the Defendant's Motion to Dismiss.

## PROCEDURAL HISTORY

On May 30, 2022, local, state, and federal law enforcement launched a criminal investigation into Defendant's conduct that killed a woman and severely injured two children. The state investigation led to formal charges against Defendant on September 22, 2022. Defendant is charged in a seven-count information, in State of Florida v. Daniel Gavin Couch, case number 22CF00240AM, with one-count of Manslaughter, two-counts of personal injury through criminal negligence, and four-counts of health and safety violations while engaged in commercial parasailing. Defendant was released on bond. On August 7, 2025, a federal grand jury sitting in the Southern District of Florida returned a single-count indictment to charge the Defendant with Seamans Manslaughter, in violation of 18 U.S.C. § 1115.  Defendant was again released on bond. On December 2, 2025, the undersigned entered a notice of appearance in this case. On April 9, 2026, the federal grand jury returned a superseding indictment and charged Defendant with Voluntary Manslaughter, in violation of 18 U.S.C. § 1112 (count1), and Seamans Manslaughter, in violation of 18 U.S.C. § 1115 (count 2). Defendant has not yet been arraigned on the superseding indictment; trial is set April 20, 2026, in Key West, Florida.

## FACTUAL BACKGOUND

On May 30, 2022, Defendant made a deliberate decision that ended the life of 33-year old mother and wife, S.A.

Aboard the M/V Airborne were 12 passengers, and two crew members. The 12 passengers were family and friends who traveled to Florida from Illinois. Nine (9) members of that group were paid to fly and three (3) members paid a transport fee to be aboard the vessel.  The M/V Airborne was owned by Lighthouse Parasail, and it was a U.S. Coast Guard licensed vessel for hire. Defendant, the Captain, was licensed captain who had been working as a boat captain and parasail operator for approximately 15 years. M/V Airborne left its marina in Marathon, Florida at approximately 4:30 p.m. After a half-hour boat ride three to five miles into the Gulf of America, the vessel stopped, and the first group of three (3) parasailers were launched into the air. The time was approximately 5:00 p.m., and the sky above the vessel was light with white clouds and bright blue skies. Just beyond, in the immediate distance, there were grey clouds that signaled a front was approaching. Defendant loaded up the next three (3) parasailers, which included S.A.; her minor son, and another minor from the group. All three smiled for pictures as Defendant launched the parasail into the dark clouds and gloomy sky. A short time later, Defendant's voice is captured on audio and video recordings talking about the weather. Not only did Defendant acknowledge the weather was getting worse and likely too bad for the third group to fly, but Defendant also stated it was his intent to finish the current ride and not end the ride early.

As the weather worsened, gusting and sustained winds nearly doubled the manufacturers recommended top wind speed and exceeded the State's regulation for parasailing permitting winds. When the ride ended, Defendant tried to reel in the parasail, but the wind overpowered the motor, and the winch wasn't able to retrieve the tow line that tethered the parasail to the boat. S.A. and the two children dangled more than 150-feet in the air as Defendant shouted "Shit. Shit, shit!." Defendant began to panic. In violation of industry standards and State regulations, Defendant was not monitoring the weather. Defendant was essentially flying the parasailers blind. Defendant did

not know how long the winds were expected to last and did not know whether the forecasted winds were worse than the winds he was experiencing. M/V Airborne was essentially dead in the water. Defendant could not operate the engine of M/V Airborne against the winds that were controlling the parasail. Essentially, Defendant lost control of the parasail and the vessel. Defendant would later recall his concern, and fear, that the parasail would drag M/V Airborne into the nearby bridge or onto one of the numerous sandbars.  Without much contemplation, Defendant cut the tow line that tethered the parasail to the vessel.

The "chute wrangler," is a safety control device that is intended to deflate and anchor a parasail once the parasail is no longer attached to a vessel. A primitive contraption comprised of parasail lines and a fillable cone or sea anchor, the chute wrangler is designed to prevent the wind from picking up and carrying away untethered parasailers. If installed properly, the chute wrangler is designed to deflate the canopy and inflate a cone shaped sea anchor to keep the parasail stable, in the water, and not influenced by the wind. In this case, the chute wrangler was not installed properly and arguably accessible to S.A. and the two children. Defendant intentionally disconnected S.A. and the children from the safety of the vessel knowing that he was relinquishing all control of the parasail, and leaving their fate to a ferocious squall and a concrete bridge. Their fate would be no worse than that of a kite flying in the winds of a hurricane winds.

Immediately after Defendant severed the tow line, winds scooped up the parasail high into the clouds and suddenly dropping the parasail into the waters of the Gulf of America. Defendant tried to maneuver the vessel to catch the parasail. The winds, again, picked up the parasail and dragged the canopy of the parasail across the top of the vessel. S.A.'s husband watched his wife's head hit the vessel as the parasail jumped over the vessel and raced across the waters toward the Old 7 Mile Bridge. After a short attempt to recover the parasail, Defendant left S.A. and the

children. Defendant stopped his vessel and told the boat passengers that the bridge would stop the parasail. At 25 to 30 mph, the winds violently dragged the S.A. and the children across the water for nearly 2 to 3 miles. Witnesses from nearby charter boats reported hearing screams and seeing arms and legs flailing on the water until the parasail slammed into a piling belonging to the Old 7 Mile Bridge. A good Samaritan arrived seconds after the bodies hit the piling. S.A. was in the water, face down, without a pulse.  S.A. was later pronounced dead, and the medical examiner determined the cause of death was drowning with blunt force trauma to the head.

While preparing jury instructions for trial, the government read several cases, including United States v. McKee, 68 F.4th 1100 (8th Cir. 2023). In 2018, 17 people died and dozens more were injured when a commercial tourism boat sank in the Ozarks. The government charged Seamans Manslaughter and operating a vessel in a grossly negligent manner. The District Court dismissed the 47-count indictment because the lake where the incident occurred was not considered "navigable waters of the United States….." The Eighth Circuit upheld the lower court's dismissal. Id. Specifically, the District Court relied upon the Eighth Circuit's decision in Edwards v. Hurtel, 717 F.2d 1204 (8th Cir. 1983), in which the claim for admiralty jurisdiction was denied based upon the following facts:

> "The recreational nature of Table Rock Lake is generally known within the territorial jurisdiction of this Court. The lake has not been susceptible of use for commercial shipping and in fact has been used exclusively for recreational activities. Furthermore, there is no reasonable likelihood that Table Rock Lake will become or be made navigable in the near future."

717 F.2d at 1205.

In McKee, the Eighth Circuit took a deep dive into the history of Seamans Manslaughter and found the statue originated in 1838 as part of an act to prevent boiler explosions on steamboats plying 'the bays, lakes, rivers, or other navigable waters of the United States." United States v.

Allied Towing Corp., 602 F.2nd 612, 614 (4th Cir. 1979) (quoting Act of July 7, 1838, ch. 191, §

2, 5 Stat. 304, 304). After several changes, Seamans Manslaughter is now in the Homicide section

of the U.S. Codes at 18 U.S.C. § 1115, under the general jurisdiction of Admiralty and not Special

Maritime and Territorial Jurisdiction.

The Eighth Circuit in McKee further acknowledged:

"[T]he primary focus of federal admiralty jurisdiction 'is unquestionably the protection of
maritime commerce.' Foremost Ins. Co. v. Richardson, 457 U.S. 668, 674, 102 S.Ct. 2654,
73 L.Ed.2d 300 (1982); see Sisson v. Ruby, 497 U.S. 358, 362, 110 S.Ct. 2892, 111 L.Ed.2d
292 (1990) ('[P]rotecting commercial shipping is at the heart of admiralty jurisdiction ....').
And the purpose of § 1115's earliest precursor was, by its own terms, to provide for the
better security of the lives of passengers on board of vessels' traveling on 'bays, lakes,
rivers' and other channels of commerce. Act of July 7, 1838, ch. 191, § 2, 5 Stat. 304. Yet
the fact that a federal criminal statute impacts or touches on maritime commerce does not
mean that the statute's reach necessarily extends to any conduct that Congress could
arguably regulate through its Commerce Clause power."

Id. at 1107.

The Eighth Circuit further affirmed the dismissal of all counts related to gross negligence

in the operation of a vessel, in violation of 18 U.S.C. §2302(b), on the same grounds because the

history of §2302(b) is rooted in general admiralty law and requires navigable waters. Essentially,

a water is "navigable in fact" when it is "used or susceptible of being used, in their ordinary

condition as highways for commerce, over which trade and travel are or may be conducted in the

customary modes of trade and travel on water." The Daniel Ball, 77 U.S. 557, 10 Wall.

The government followed the case law and determined admiralty jurisdiction must first

exist before the Court can apply admiralty law. Doe v. Celebrity Cruises, Inc., 394 F.3d 891, 899

(11th Cir. 2004). For admiralty jurisdiction to exist over a tort claim, the location test and the

connection test must be satisfied. Id. at 900. The location test is satisfied if the "tort occurred on

navigable water or ... the injury suffered on land was caused by a vessel on navigable water."

Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995). The

connection test requires (1) that the incident causing the alleged harm must have a potentially disruptive impact on maritime commerce and (2) that the activity giving rise to the incident must have a substantial relationship to maritime activity." Id.

"A waterway is navigable provided that it is used or susceptible of being used as an artery of commerce." Adams v. Montana Power Co., 528 F.2d 437, 439 (1975) (citing The Daniel Ball, 77 U.S. 557, 10 Wall. 557, 19 L.Ed. 999 (1870)). Commerce, under admiralty jurisdiction, is defined as activities related to the business of interstate or international shipping. The Daniel Ball, 77 U.S. at 563, 77 U.S. 557. Admiralty makes no distinction between natural and man-made bodies of water; navigable waters are simply those that are "navigable in fact, or readily susceptible or being rendered so." Rapanos v. United States, 547 U.S. 715, 723, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006).

The second part of the test is to determine whether the activity conducted is a traditional maritime activity that will support admiralty jurisdiction.

In Beiswenger Enterprise Corp. v. Carletta, 779 F.Supp.160 (M.D. Florida, Tampa Division, 1991), the Court heard allegations of negligence directly related to the use and mishandling of descent of parasailers who claimed injuries after the release of the tow line. Specifically, the injuries included neck and spinal injuries from plunging into the water. The Court in Tampa ruled that the injuries were not injuries that are common in maritime and thus admiralty law did not apply. The court also found that the injuries, which were caused when one of the plaintiffs was dragged on land, and the other was caused by the plunge into and removal from the water were not "commonly maritime." Id.; see also Hurley v. Larry's Water Ski School, 762 F.2d 925 (11th Cir. 1985) (water skier suing for injuries during ski lessons); Gulf Oil Corp. v. Griffith, 330 F.2d 729 (5th Cir. 1964) (action for wrongful death of skiers electrocuted by electrical current);

Reed v. United States, 604 F. Supp. 1253 (N.D. Ind. 1984) (diving off of a boat into water not sufficiently related to traditional maritime activity). Id. In Harville v. Johns-Manville Products Corp., 731 F.2d 775, 786 (1984), the Eleventh Circuit noted:

> "In Executive Jet the Supreme Court described admiralty as dealing with navigational rules, apportionment of liability for maritime disasters, protection of seamen aboard ship, and establishment of uniform rules for maritime liens, captures of prizes, liability for cargo damage, and claims for salvage. 409 U.S. at 269–70, 93 S.Ct. at 505. The Court has also stated that "the primary focus of admiralty jurisdiction is unquestionably the protection of maritime commerce." Foremost Insurance, 457 U.S. at 674, 102 S.Ct. at 2658. Our precedent indicates that "[a]dmiralty jurisdiction in the federal courts was predicated upon the need for a uniform development of the law governing the maritime industries." Peytavin v. Government Employees Insurance Co., 453 F.2d 1121, 1127 (5th Cir.1972). Disputes not involving these interests are not within the admiralty jurisdiction of the federal courts."

> Id. at 786.

The government analyzed the relevant case law and determined there is an argument that the waters where S.A. was killed, although shallow, are part of the Gulf of America—and the Gulf of America is considered navigable waters for admiralty law. The government further examined the type of activity that S.A. was engaged in when she was killed and aligned S.A.'s death to the facts presented in Cobb v. Aramark Sports and Entertainment Services, LLC., 933 F.Supp. 2d 1295 (D. Nevada 2013), and in that case the District Court in the District of Nevada determined parasailing activity was sufficient to establish admiralty jurisdiction. But the government's thorough analysis netted zero results for the admiralty jurisdiction issue related to Seamans Manslaughter in the Eleventh Circuit Court of Appeal or Florida Southern District Court. Southern District of Florida, criminal realm. As a result of a review of charges in this case, the government superseded the indictment to ensure the government's prosecution of Defendant would continue even if the Seamans Manslaughter count were dismissed after jeopardy attached.

**LEGAL ARGUMENT**

The Supreme Court has held that in certain extreme circumstances, pre-indictment delay can violate the Due Process Clause. But in those extreme circumstances, the burden is on the defendant to show both "actual substantial prejudice and that the delay was the product of a deliberate act by the government designed to gain a tactical advantage." United States v. Foxman, 87 F.3d at 1220, 1222 (11th Cir. 1996).

### a. Voluntary Manslaughter

Defendant's Motion to Dismiss suggests Count 1 of the superseding Indictment should be dismissed on its face. The argument in support of the dismissal ignores the elements of Voluntary Manslaughter and the facts presented in this case. Defendant is a seasoned mariner who made the decision to transport passengers for the purpose of parasailing without ever checking the forecasted weather conditions. Defendant's negligent navigation of M/V Airborne can be argued as the proximate cause of S.A.'s death. Defendant's panicked state arose when he was faced with heavy gusts of wind that ultimately left him unable to control the vessel and the parasail. Defendant admitted to being fearful that the parasail would pull his vessel toward the bridge or toward a sandbar. Another person in the shoes of the Defendant, at that time, may have also felt the same fear. But Defendant's use of deadly force—cutting the tow line resulting in S.A.'s death by drowning—was not justified. Evidence presented at trial will establish the multitude of other things that Defendant could have done and should have done before cutting the line in 25 to 30 mph winds. The Defendant's deliberate decision to cut loose the parasail was an intentional act and not the result of negligence. Seamans Manslaughter only requires a negligent act as explained in United States v. Boylan, 24-3077, 24-6045, D.C. No. 2-22-cr-00482-GW-1. Voluntary

Manslaughter requires more than negligence and the government is prepared to prove more than negligence.

Defendant's Motion to Dismiss suggests so nefarious attempt to gain a "lesser included offense" by charging Voluntary Manslaughter. The assumption is absurd. The reality is involuntary manslaughter is a lesser included offense of voluntary manslaughter. The rampant speculation about the government's inclusion of a jury instruction is ridiculous and frankly a stretch beyond the reach of reality.

Defendant killed S.A. in a state of mind fueled by fear and his fear, whether reasonable or not, did not justify his use of deadly force. The elements of Count 1 account for Defendant's actions in this case and the charge in the superseding indictment should not be dismissed.

**b.  Unnecessary and Intentional Delay**

A prosecutor may seek a superseding indictment at any time prior to a trial on the merits. United States v. Stricklin, 591 F.2d at 1115 n. 1; United States v. White, 524 F.2d 1249, 1253 (5th Cir.1975), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976). Again, the suggestion that the government's superseding indictment was the result of unnecessary and intentional delay is without merit. The grand jury returned a superseding indictment on April 9, 2026. The superseding indictment was obtained based upon the uncertainty of which way the Court may rule as it pertained to admiralty jurisdiction in this case. On April 13, 2026, the Defendant provided his jury instruction for Seamans Manslaughter which included the following:

*The Defendant can be found guilty of this crime only if all of the following facts are proven beyond a reasonable doubt:*

1.      *the Defendant was a captain employed on a vessel;*

2.      *the Defendant engaged in misconduct and/or acted with gross negligence which means acting with wanton or reckless disregard for human life. To establish reckless disregard for human life, it must be shown that (1) Defendant was aware of the serious risk to human life which his conduct created, or Defendant knew of facts which, if considered and weighed in a reasonable manner, indicate a substantial and unjustifiable risk to human life; and (2) he deliberately disregarded that substantial and unjustifiable risk of creating potentially life-threatening, condition of which he was aware;*

3.      *the Defendant's misconduct and/or gross negligence was the proximate cause of the death of a person on board the vessel. A proximate cause is one that played a substantial part in bringing about the death, so that the death was the direct result or a reasonably probable consequence of the Defendant's misconduct and/or gross negligence;*

4.      *at least one of the deaths occurred within federal admiralty jurisdiction. Federal admiralty jurisdiction exists if a death occurs on a vessel engaged in commercial activity and on navigable waters that is used or susceptible of being used for maritime commerce or activity.*

*"Negligence" is a breach of duty, which means an omission to perform some duty, or a violation of some rule or standard of care, which is made to govern and control one in the discharge of some duty.*

*You may conclude that the loss of life was proximately caused by the misconduct, negligence, or inattention to his duties by the defendant only if the misconduct, negligence, or inattention to his duties played a substantial part in bringing about or actually causing the death and that the death was a direct result or a reasonably probable consequence of the misconduct, negligence, or inattention to duty.*

*If the death was caused by a force or event other than the defendant's negligence, misconduct, or inattention to his duties, the defendant's conduct cannot have proximately caused the death unless the force or event was a reasonably foreseeable consequence of his conduct.*

Based on Defendant's jury instructions, which specifically included "death occurs on a vessel engaged in commercial activity and on navigable waters that is used or susceptible of being used for maritime commerce or activity," Defendant's defense mirrored that of the defense in Mckee, 68 F.4th 1100 (8th Cir. 2023). Thus, had the government not superseded the indictment, the government would have still faced a motion to dismiss, or a judgment of acquittal—but for the Seamans Manslaughter charge—with no other charge indicted. Therefore, the delay in filing the superseding indictment was not unnecessary.  It is important to note that the Defendant's proposed jury instructions are a stark departure from the jury instructions in the recent Seamans Manslaughter trial, in the Southern District of Florida, U.S. v. Dustin McCabe. *See* 24-cr-80103-Cannon.

Before the Court even considers whether the government intentionally delayed for a tactical advantage, Defendant must show that he suffered actual, substantial prejudice due to the delay. A "stringent standard is employed when examining the issue of prejudice." United States v. LeQuire, 943 F.2d 1554, 1560 (11th Cir. 1991). The Eleventh Circuit has rejected speculative prejudice: "[A]ctual prejudice, and not merely the real possibility of prejudice inherent in any extended delay, must be demonstrated." Stoner v. Graddick, 751 F.2d 1535, 1544 (11th Cir. 1985) (internal quotations omitted); see also United States v. Corbin, 734 F.2d 643, 647-48 (11th Cir. 1984) (assertion that several prospective witnesses died, without more, fails to establish requisite prejudice.) The prejudice must not only be actual, but also "substantial." Stoner, 751 F.2d at 1541 (A "due process violation based on pre-indictment delay [occurs] if a showing of substantial

prejudice had arisen out of a delay intentionally fostered to give the prosecution a tactical advantage.") (emphasis original). Moreover, the Eleventh Circuit has consistently found that the prejudice in pre-indictment delay is prejudice at trial. See, e.g., United States v. Wetherald, 636 F.3d 1315, 1324 (11th Cir. 2011) ("To establish that a pre-indictment delay violated his due process rights, a defendant must show ... that he was actually prejudiced by the delay in preparing his defense"); United States v. Butler, 792 F.2d 1528, 1533-34 (11th Cir. 1986); United States v. Solomon, 686 F.2d 863, 872 (11th Cir. 1982) ("The prejudice shown must be such as to impair the fairness of the trial."); cf. Foxman, 87 F.3d at 1223 n.2 ("[M]any delays in obtaining an indictment would not be 'tactical'--a word which we think inherently includes the concept of intentionally maneuvering for an advantage at trial.").

There is no actual prejudice to Defendant. The evidence in this case remains the same. The defense strategy, such as springing a motion to dismiss upon the government in mid-trial may have changed, but that does not amount to prejudice at trial.

### c.   **Tactical Advantage**

Defendant cannot show actual, substantial prejudice to his defense. But even if he could, "substantial prejudice from delay, standing alone, does not violate due process." Foxman, 87 F.3d at 1223 (finding that a ten-year, pre-indictment delay prejudiced defendant but remanding to the trial court for a finding as to whether the government delayed the indictment to gain a tactical advantage). "[P]roof of prejudice is generally a necessary but not sufficient element of a due process claim, and ... the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." Lovasco, 431 U.S. at 790.

In Wetherald, the Eleventh Circuit explained, "We look at unreasonableness in pre-indictment delay cases through the lens of tactical advantage, and the court 'has said that the

motivations behind the delay must violate 'fundamental conceptions of justice,' or a sense of 'fair play' or 'decency.' " 636 F.3d at 1324. Under this standard, the prosecution must have deliberately caused the delay to gain a tactical advantage. Id.

The Courts have universally recognized that investigative delay, in contrast to tactical delay, is not grounds for the indictment to be dismissed. The Supreme Court has stated that "investigative delay is fundamentally unlike delay undertaken by the Government solely to gain tactical advantage over the accused." Lovasco, 431 U.S. at 795 (internal quotations omitted). "Rather than deviating from elementary standards of 'fair play and decency,' " the Court explained, "a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able to promptly establish guilt beyond a reasonable doubt." Id. As the Eleventh Circuit explained in LeQuire, "[E]ven where the defendant has been prejudiced by pre-accusation delay, if it is investigative delay the defendant has not been deprived of due process." 943 F.2d at 1560.

But the government is not required to have a "good reason" for the delay to prevail. The burden is on the defendant to show some sort of intentional, tactical delay, and "where the record shows no reason for the delay ... no due process violation exists." Foxman, 87 F.3d at 1223 n.2. Nor is delay caused by governmental negligence a tactical delay. Id.; United States v. Lamb 214 F. App'x 908, 912 (11th Cir. 2007) (determining that a five year pre-indictment delay did not violate defendant's due process rights as the delay was primarily due to negligence and not because the government sought to gain a tactical advantage); United States v. Benson, 846 F.2d 1338 (11th Cir. 1988) (finding that at least half of an eight-year delay was admittedly caused by pure negligence; however, the delay was not unconstitutional absent a showing the government deliberately delayed to gain a tactical advantage); Stoner, 751 F.2d at 1535 (finding that although the Government

offered no reason or justification for 19-year delay between crime and indictment, defendant's due process rights were not violated because defendant failed to show intentional delay to gain a tactical advantage). Neither is delay caused by the government directing its resources toward other cases a delay to gain a tactical advantage. <u>United States v. Barragan</u>, 752 F. App'x 799, 801 (11th Cir. 2018).

In this case, Defendant's Motin to Dismiss speculates but dos does not support an allegation of tactical delays. Relief is available to Defendant when he can establish a purposeful tactical delay that prejudice. Therefore, this court should deny Defendant's Motion to Dismiss.

<u>**CONCLUSION**</u>

Based upon the foregoing, the government respectfully requests that the Court deny Defendant's motion to dismiss.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By:   /s/ Breezye Telfair
Breezye Telfair
Assistant United States Attorney
Florida Bar No. 18055
99 NE 4th Street, Suite 500
Miami, Florida 33132
Tel: (305) 961-9329
Email: Breezye.Telfair@usdoj.gov